JUDE G. GRAVOIS, Judge.
 

 | gDefendant, Jose C. Santos, has appealed his conviction for manslaughter in violation of LSA-R.S. 14:31. For the following reasons, we affirm.
 

 FACTS
 

 On January 5, 2007, defendant was residing in an apartment located at 4209 Asher Court, Apartment C, Kenner, Louisiana, with four other individuals. On that evening, three of the individuals, Teodoro Perrier Hernandez, Maria Cotrera and Jose Manuel Martinez-Valencia, were cooking dinner while the other two individuals, Juan Hernandez Perrier and defendant, Jose Santos, were sleeping upstairs. Jose Manuel and Teodoro left the residence to buy beer at approximately 6:30 p.m. and again at 9:30 p.m. Jose Manuel, Teodoro, and Maria watched a movie until midnight, at which time Jose Manuel and Teodoro made another trip to the store for beer. When they returned, Jose Manuel and Teodoro woke defendant. Defendant then drank beer with them while they listened to music and talked ploudly. At approximately 1:30 a.m. on January 6, 2007, Maria went upstairs and told the men to turn down the music so that the neighbors would not call the police. The three men laughed at her and played the music louder. Maria got a pillow and blanket and went to sleep in Jose Manuel’s car.
 

 Maria testified that at approximately 4:00 a.m., Jose Manuel, Teodoro and defendant took the car, with her sleeping in the back, to buy more beer. When they returned to the apartment, Maria remained in the car while the men went inside. Maria awoke periodically and could hear the men talking loudly. At one point, she called from the car to ask them to turn down the music.
 

 At approximately 8:30 a.m. or 9:00 a.m. Maria was asleep in the car when she was awakened by the sound of defendant exiting the apartment. Maria testified that shortly after he exited the apartment, defendant knocked on the window of the car and told her that he had killed Jose Manuel. Maria did not believe defendant, but when she opened the car door, she observed blood on his shoes. Maria attempted to use defendant’s cell phone to call the police, but defendant took the phone from her and walked away.
 

 Maria then attempted to enter the apartment but couldn’t because it was locked. At this time, Maria observed Teo-doro walking toward her from the back of the building. Maria testified that Teodo-ro’s hands and clothes were clean, and that he tried, unsuccessfully, to enter the apartment and then walked away down the side alley. She did not speak to Teodoro. Maria was ultimately able to enter the apart
 
 *170
 
 ment where she discovered Jose Manuel’s dead body covered with a blanket on the bathroom floor.
 

 After she discovered the victim, Maria left the apartment and asked two men across the street to call the police. When the Kenner Police Department arrived at |4the apartment, they broke into the front entrance of the apartment and found Jose Manuel dead on the bathroom floor.
 

 Detective David Stromeyer, the lead investigator on the case, testified that the officers found a knife, with water running over it, in the bathroom sink. Detective Stromeyer further testified that the victim’s feet had been bound with a shoelace, and that defendant’s footprint was found in the blood covering the bathroom floor. Detective Stromeyer also confirmed that the knife contained D.N.A. consistent with both the victim and defendant.
 

 Several officers, including Sergeant Louis Tusa, Officer Kenneth St. Germain, Sergeant Michael Cunningham, and Officer Ninoska Guggenheim, a Spanish-speaking police officer, canvassed the area around the apartment in an effort to locate a suspect in the homicide. Approximately half a mile from the scene, Sergeant Cunningham spotted defendant, a Hispanic male who matched the physical description of the suspect, and ordered him to the ground. Officer Guggenheim gave verbal commands in Spanish, ordering defendant to get on the ground. Defendant complied.
 

 Sergeant Cunningham then handcuffed defendant, observing that there was a cut and blood on defendant’s hand, and blood on his shoes. Sergeant Cunningham conducted a pat-down for weapons, and found a bulge in defendant’s pocket. This bulge turned out to be an “Idenb-A-Kid” card bearing the name of the victim’s daughter and a piece of paper bearing the victim’s name.
 

 Officer Guggenheim testified that in response to his questions, defendant stated that his name was Orlando and that he lived at one of the apartments at 80 Antigua with his uncle. Officer Larry Lacr-outs, the crime scene technician, photographed defendant and swabbed his hands for blood. In addition to the blood on defendant’s shoes, the officers observed blood on the front of defendant’s jeans. |5 Defendant was subsequently positively identified by Maria as the man who said he had killed Jose Manuel.
 

 Defendant was subsequently arrested and was advised of his rights by Irma Morehouse, a Spanish-speaking correctional officer for the Kenner Police. Ms. Morehouse testified that she asked defendant if he understood his rights and defendant responded affirmatively. Ms. More-house admitted that she was not familiar with the language of Kaqchikel, defendant’s native language; she explained, however, that she did not have any difficulty communicating with defendant.
 

 In addition to Maria, two other residents of the apartment were called by the State as witnesses at trial. Juan Hernandez Perrier testified that he left the apartment at Asher Ct. at 6:30 a.m. on the morning of January 6, 2007, that he was picked up by Humberto Sanchez to go to work, and that defendant said he was not going to work that day. When Juan left the apartment, Teodoro was asleep downstairs. Juan further testified that defendant called him three times at approximately 9:30 a.m. and said “I killed him with a knife.” Defendant was laughing as he told Juan that he killed the victim because the victim was taunting him. Juan further testified that defendant said he was not going to return to the apartment because of the police.
 

 Teodoro Perrier Hernandez testified at trial that, on the morning of January 6,
 
 *171
 
 2007, he was asleep in the apartment at Asher Ct. and was awakened by the sound of a person screaming upstairs. As he started to walk up the stairs, he observed defendant coming down the stairs with blood on him. Teodoro further testified that as defendant was coming down the stairs, he said “I killed him.” Teodoro testified that he became afraid when he saw the blood, and for that reason |fileft the apartment. A short time later the police stopped him and then let him go. At that point, he went to work.
 

 Humberto Sanchez, a co-worker of Juan and defendant, testified at trial that defendant did not go to work on the morning of January 6, 2007 because he said he had been drinking all night. Mr. Sanchez further testified that defendant told him he killed the victim because the victim had hurt his hand with a bat.
 

 At trial, defendant testified that on the morning of the murder, he, the victim and Teodoro had been drinking. The victim told defendant that he wanted to fight with him. Defendant responded that he did not want to fight but the victim hit him in the face. They fought and ended up in the bathroom where defendant fell on the floor. Defendant then got on top of the victim and hit the victim on the face. Teo-doro came in and defendant told Teodoro that he was going to kill the victim. According to defendant, Teodoro went to get the knife. Defendant admitted that he held a knife to the victim’s skin, but only made a scratch and there was no blood. Defendant testified that Teodoro grabbed the knife from his hand and stabbed the victim and blood was “gushing” all over Teodoro’s face. Teodoro then cleaned up and left the apartment.
 

 Defendant admitted telling Maria, Mr. Sanchez and Juan Hernandez Perrier that he killed Jose Manuel, but during his testimony at trial, he continued to blame Teo-doro for the killing of Jose Manuel. Defendant explained that he lied to the police about his identity when he was arrested in order to defend Teodoro. According to defendant, Teodoro told defendant that if defendant was arrested, Teodoro would get him out of jail. Defendant testified that after the victim was dead, he grabbed the victim’s legs and emptied his pockets, explaining that this would help him identify the victim for the police.
 

 17ASSIGNMENT OF ERROR NUMBER ONE
 
 — IMPROPER
 
 TRANSLATORS
 

 In his first assignment of error, defendant argues that the trial court failed to insure that the proceeding against defendant was properly translated, resulting in a denial of due process. Defendant contends that the translators utilized in the present case were not properly screened by the trial court in a manner sufficient to ensure due process. Defendant further contends that because his native language is Kaqchikel,
 
 [1]
 
 and not Spanish, the proceedings were improperly interpreted to him by an interpreter who was not familiar with his native language, dialect, and accent. Finally, defendant contends that the translation protocol implemented by the trial court was inconsistent and inadequate because there were certain appearances at which no interpreter was present. Defendant admits, however, that trial counsel did not object to the interpretation provided.
 

 The State responds that there is no trial court ruling to assign as error because the defense failed to object to any irregularities or errors concerning the interpreters
 
 *172
 
 who assisted either pre-trial, during trial, or post-trial. The State further responds that defendant fails to articulate any particular errors in the interpretation provided to defendant. Specifically, the State contends that defendant was provided with an interpreter for every court appearance and, that if an interpreter failed to appear, the matter was continued. Finally, the State contends that defendant fails to show that the interpreters improperly translated any of the testimony at trial.
 

 LSA-C.Cr.P. art. 841 A provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” The contemporaneous objection rule serves “to put the trial judge on notice of an|salleged irregularity so that he may cure the problem, and to prevent the defendant from gambling on a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection.”
 
 State v. Rodriguez,
 
 02-334 (La.App. 5 Cir. 1/14/03), 839 So.2d 106, 134,
 
 writ denied,
 
 03-0482 (La.5/30/03), 845 So.2d 1061,
 
 cert. denied,
 
 540 U.S. 972, 124 S.Ct. 444, 157 L.Ed.2d 321 (2003) (citing LSA-C.Cr.P. art. 841;
 
 State v. Thomas,
 
 427 So.2d 428, 433 (La.1982);
 
 State v. Snyder,
 
 97-226 (La.App. 5 Cir. 9/30/97), 700 So.2d 1082, 1087). In the present case, because there was no objection made by defendant
 

 to either the qualifications of or performance by the interpreters during the trial, this issue has not been preserved for appellate review.
 

 Moreover, even if the issue had been preserved for appellate review, defendant’s contention that there were errors or inadequacies with the interpretation provided is without merit. First, with regard to defendant’s contention that interpreters were not present at certain hearings, a review of the record shows otherwise. Particularly, on January 29, 2007, an interpreter was present for the preliminary hearing. On February 15, 2007, the arraignment was continued because an interpreter was not present; when the arraignment was held the next day, an interpreter was present. When defendant appeared before the Court on March 23, 2007 for a pre-trial conference, an interpreter was not present, and at the request of defense counsel, the pre-trial conference was continued until April 10, 2007 so that an interpreter could be appointed. In fact, the record is clear that defendant was thereafter provided with an interpreter at every court appearance at which he appeared.
 
 [2]
 

 ^Louisiana C.Cr.P. art. 25.1 requires the court to appoint an interpreter
 
 *173
 
 for a non-English-speaking person who is a principal party in interest or a witness in a proceeding before the court after consultation with the non-English-speaking person or his attorney. This article states the interpreter must be “competent” to interpret or to translate the proceedings to him and to interpret or translate his testimony. However, there is no law in Louisiana that requires interpreters, other than interpreters who translate for the hearing impaired, to be certified.
 
 [3]
 
 In
 
 State v. Gonzales,
 
 97-767, p. 5 (La.App. 5 Cir. 1/14/98), 707 So.2d 82, 84, this Court held that the record supported a valid guilty plea, despite the defendant’s contention that he could not understand the proceedings against him. In that case, the defendant spoke Spanish, and little or no English.
 
 Gonzales,
 
 97-767 at 4, 707 So.2d at 84, n. 1. Through an interpreter, the defendant entered a guilty plea after being advised of his lights, and the
 
 Boykin
 

 [4]
 

 colloquy was translated by the interpreter. This Court affirmed the trial court’s denial of the defendant’s motion to withdraw his guilty plea, reasoning that there was no evidence to show the defendant could not understand the consequences of his guilty plea.
 
 Gonzales,
 
 97-767 at 5, 707 So.2d at 84.
 

 This Court has further held that when a defendant has assigned no specific prejudice arising out of an interpreter’s translations, there is no abuse of discretion in a trial court’s decision to deny a motion for mistrial.
 
 State v. Lai
 
 04-1058, p. 12 (La. App. 5 Cir. 4/26/05), 902 So.2d 550, 558-59,
 
 writ denied
 
 05-1681 (La.2/3/06), | in 922 So.2d 1175. This Court has further reeog-nized that a conviction should not be reversed unless the accused’s substantial rights have been violated, and that because the record did not reflect any prejudice sustained by the defendant, his substantial rights were not prejudiced.
 
 Id.
 

 Similarly, in the present case, there is nothing in the record to show that the testimony was improperly translated or that defendant did not understand the proceedings against him. Defendant did not object to the qualifications of or performance by any of the interpreters. Additionally, Ms. Morehouse, the Spanish-speaking correctional officer who explained defendant his rights when he was arrested, testified that she had no problem communicating with defendant in Spanish. Our review of the record indicates that defendant’s substantial rights have not been prejudiced. As such, this assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER TWO
 
 — DENIAL
 
 OF MISTRIAL
 

 In his second assignment of error, defendant contends that the trial judge should have granted his mistrial motion because the State impermissibly elicited other crimes evidence during Maria Cotr-era’s testimony. Specifically, when asked “Who is Jose Santos?,” Maria, through the interpreter, replied “The one who’s in jail.” Immediately following Maria’s response, defense counsel moved for a mistrial. The motion was taken under advisement and ultimately denied, with the trial judge admonishing the jury to disregard the statement made by Maria and ordering that the statement be stricken from the record.
 

 
 *174
 
 The State responds that a mistrial was not mandated or warranted under LSA-C.Cr.P. art. 770 because the comment was made by a lay witness and not by an officer of the court, a judge, district attorney, or a court official, and that an admonition under LSA-C.Cr.P. art. 771 provides the proper remedy. The State |, further responds that defendant was not entitled to a mistrial because Maria did not testify regarding another crime committed or alleged to have been committed by defendant. Finally, the State responds that Maria’s testimony was non-responsive to the question posed.
 

 Under LSA-C.Cr.P. art. 775, “[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.” Regarding prejudicial remarks or comments, LSA-C.Cr.P. art. 770 provides:
 

 Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
 

 * * *
 

 (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
 

 * ⅜ *
 

 Article 770 does not generally apply to testimony by a State witness because witnesses are not considered “court officials.”
 
 State v. Thomas,
 
 08-113, p. 9 (La. App.5 Cir. 6/19/08), 988 So.2d 750, 756. However, Article 770 may be triggered if an impermissible reference to other crimes is deliberately elicited by the prosecutor because such testimony is imputable to the State.
 
 Id.
 

 A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial.
 
 State v. Smith,
 
 04-340, p. 5 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 285. Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion.
 
 Id.
 

 | i2A trial judge is required to admonish the jury to disregard a comment made within the hearing of the jury that is irrelevant, immaterial or prejudicial to the defendant or the State when an admonishment is requested by the defendant or the State.
 
 State v. Smothers,
 
 02-277, p. 15 (La.App. 5 Cir. 12/30/02), 836 So.2d 559, 569,
 
 writ denied,
 
 03-0447 (La.10/10/03), 855 So.2d 329. This article applies to remarks or comments made by a witness regardless of whether the remark or comment is -within the scope of LSA-C.Cr.P. art. 770.
 
 Smothers,
 
 02-277 at 16, 836 So.2d at 569. The trial court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
 
 Id.
 

 In
 
 State v. Williams,
 
 04-1309, p. 12 (La.App. 5 Cir. 4/26/05), 902 So.2d 485, 494,
 
 writs denied,
 
 05-1640 (La.2/3/06), 922 So.2d 1173 and 05-1640 (La.2/3/06), 924 So.2d 144, this Court held that the trial court did not abuse its discretion by denying a motion for mistrial based on potentially prejudicial comments made by the prosecutor in the presence of the jury. Specifically, during cross-examination of a witness, the prosecutor commented that the defendant had been in jail for two years.
 
 Williams,
 
 04-1309 at 9, 902 So.2d
 
 *175
 
 at 493. This Court determined that the comment did not fall under the mandatory provisions of LSA-C.Cr.P. art. 770.
 
 See id.
 
 04-1309 at 12, 902 So.2d at 494. This court further held that, despite defense counsel’s failure to request an admonition, “[t]he remark was only of such magnitude as to fall within LSA-C.Cr.P. art. 771 which requires an admonition if requested.”
 
 Id.
 
 In concluding that the remark did not result in substantial prejudice sufficient to deprive defendant of a fair trial, the court held that it was not unreasonable for the jury to assume that a defendant charged with multiple serious crimes would be incarcerated pending trial.
 
 See id.
 

 Similarly, in
 
 State v. Davis,
 
 05-733, p. 16 (La.App. 5 Cir. 2/27/06), 924 So.2d 1096, 1106, this Court held that the defendant was not entitled to a mistrial | isas a result of testimony by one of the State’s witnesses that the defendant was in jail. In reaching its conclusion, this Court determined that because the remark about the defendant being in jail was made by a witness, it did not trigger the mandatory mistrial provisions enumerated in LSA-C.Cr.P. art. 770.
 
 Davis,
 
 05-733 at 16, 924 So.2d at 1106. Additionally, this Court noted that the witness did not make specific reference to another crime but instead merely testified that he talked to the defendant about “when he was in jail.”
 
 Id.
 
 Finally, this Court in Davis held that, even assuming the testimony was improper, admission of the testimony should be deemed harmless error because the guilty verdict was not attributable to the statement.
 
 Id.
 

 In the present case, the comment at issue was made by a lay witness and not by an officer of the court, a judge, district attorney, or a court official. Moreover, because Maria’s testimony was not deliberately elicited by the prosecutor, the mandatory provisions of Article 770 were not triggered. Rather, the trial court concluded that Maria’s testimony was “not a responsive answer to the question.” Additionally, Maria’s testimony did not make specific reference to another crime, but merely referenced that defendant was in jail. Therefore, Article 770 is inapplicable to the present case.
 

 Moreover, defendant received an adequate remedy under LSA-C.Cr.P. art. 771. Following Maria’s testimony, defense counsel requested that the jury be admonished and the court complied, instructing the jury to disregard Maria’s testimony and ordering that the testimony be stricken from the record. As in
 
 Williams, supra,
 
 we find that the remark did not result in substantial prejudice to defendant because it would not be unreasonable for the jury in the present case to assume that defendant, who was charged with manslaughter, would be incarcerated pending trial.
 

 114Finally, even if the testimony were deemed improper, the error was harmless. “[T]he introduction of inadmissible other crimes evidence is subject to a harmless error analysis.”
 
 State v. Burks,
 
 04-1435, pp. 14-15 (La.App. 5 Cir. 5/31/05), 905 So.2d 394, 403,
 
 writ denied,
 
 05-1696 (La.2/3/06), 922 So.2d 1176 (citing
 
 State v. Johnson,
 
 94-1379 (La.11/27/95), 664 So.2d 94, 102;
 
 State v. Washington,
 
 03-1135 (La. App. 5 Cir. 1/27/04), 866 So.2d 973, 980). “An error is harmless when the verdict is ‘surely unattributable to the error.’ ”
 
 Burks,
 
 04-1435 at 15, 905 So.2d at 403 (citing
 
 Johnson,
 
 664 So.2d at 102).
 

 In the present case, there is ample evidence in the record to support a guilty verdict, including testimony by Maria Cotrera, Teodoro Perrier Hernandez, Juan Hernandez Perrier and Humberto Sanchez that defendant said he had killed Jose Manuel with a knife and that defendant had blood on his shoes and clothing; testi
 
 *176
 
 mony by Sergeant Michael Cunningham and Detective Stromeyer that the victim’s daughter’s identification card and other documentation bearing the victim’s name were in defendant’s possession upon arrest; evidence that the victim’s blood was found on defendant’s right hand, on the shoes and pants that defendant was wearing when he was apprehended, and on a knife found in defendant’s apartment; testimony by the coroner, Dr. Frazer Mac-Kenzie, citing stab wounds to the neck as the victim’s cause of death; and finally, testimony by defendant that he was in a physical altercation with the victim (which involved punching the victim, tying him up and holding a knife to the victim’s body) and admitting that he told others that he killed the victim. Based on the testimony and evidence presented in this case, it is clear that the verdict was not attributable to any error by the trial court in admitting Maria’s testimony regarding defendant’s incarceration. Thus we find no error in the trial court’s denial of defendant’s motion for mistrial.
 

 |
 
 ^ERRORS PATENT DISCUSSION
 

 The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990).
 

 We note a discrepancy in the minute entry dated March 18, 2009 regarding the selection of jurors. The first page of the minute entry reflects that 12 jurors were accepted. On the list of “Selected Jurors” on the second page of the minute entry, there are 13 jurors listed, including “Diane Hale,” who is noted to have been “Excused by the Defense for case” on the previous page. The jurors were polled after the guilty verdict was delivered and the polling indicates that there were actually 12 jurors.
 

 Generally, where there is a discrepancy between the minutes and the transcript, the transcript prevails.
 
 State v. Lynch,
 
 441 So.2d 732, 734 (La.1983). Thus, this matter is remanded to the trial court for the limited purpose of correcting the minute entry to reflect the actual jury composition.
 

 CONCLUSION
 

 For the foregoing reasons, defendant’s conviction is affirmed. This matter is remanded to the trial court for the limited purpose of correcting the minute entry to conform to the transcript.
 

 AFFIRMED; MATTER REMANDED.
 

 [1]
 

 . According to defendant’s brief, Kaqchikel is a Mayan language spoken by the indigenous Kaqchikel people in central Guatemala.
 

 [2]
 

 . An interpreter was present at the following court appearances, except as hereafter noted: April 10, 2007 pre-trial conference continued to June 12, 2007; June 12, 2007 pre-trial conference continued to July 10, 2007; July 10, 2007 pre-trial conference and hearing on defendant’s motion to suppress evidence continued to August 14, 2007, at which neither defendant nor interpreter were present; August 14, 2007 hearing on motion to suppress evidence; September 4, 2007 hearing on motion to suppress continued to September 17, 2007; September 17, 2007 hearing on motion to
 
 suppress;
 
 October 19, 2007 pre-trial hearing continued to November 13, 2007, at which neither defendant nor an interpreter were present; November 13, 2007 pre-trial conference continued to December 14, 2007; December 14, 2007 pre-trial hearing; February 19, 2008 status hearing at which neither defendant nor an interpreter were present; June 2, 2008 trial continued to August 18, 2008; August 18, 2008 trial date at which an interpreter was present but defendant did not appear, continued to November 17, 2008; November 17, 2008 trial date continued to March 16, 2009; February 10, 2009 motion hearing; March 16, 2009 trial date continued; March 17, 2009 motion hearing; March 18, 2009 through March 20, 2009 trial; and April 13, 2009 sentencing hearing.
 

 [3]
 

 . LSA-R.S. 15:270 relates to interpreters for deaf or severely hearing-impaired persons. LSA-R.S. 15:270 provides that the qualification of an interpreter as an expert witness is governed by the Louisiana Code of Evidence. Compare 28 U.S.C. § 1827, which provides for the use of certified and “otherwise qualified" interpreters in the federal courts, regardless of whether the interpreter is for a hearing impaired person or for a person who speaks primarily a language other than English.
 

 [4]
 

 .
 
 Boykin
 
 v.
 
 Alabama,
 
 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).